# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 16-cv-2427-WJM-KLM

NORTHGLENN GUNTHER TOODY'S, LLC, a Colorado limited liability company,

    Plaintiff,

v.

HQ8-10410-10450 MELODY LANE, LLC, a Delaware limited liability company,

    Defendant.

---

## ORDER ON PENDING MOTIONS

---

In this action, Plaintiff Northglenn Gunther Toody's, LLC ("Gunther Toody's"), sues Defendant HQ8-10410-10450 Melody Lane, LLC ("Melody Lane") for, among other things, breach of a restrictive covenant in a shopping center lease. (*See* ECF No. 8.) Currently before the Court are four motions: (1) Melody Lane's Motion for Summary Judgment (ECF No. 78); (2) Melody Lane's Motion to Exclude the Opinions of Proposed Expert Witnesses Stephen E. Poludniak, Timothy Belinski and Steve Mize ("Melody Lane's Rule 702 Motion") (ECF No. 79); (3) Gunther Toody's Motion to Exclude Defendant's Expert Richard F. Weil ("Gunther Toody's Rule 702 Motion") (ECF No. 80); and (4) Gunther Toody's Motion for Leave to File Supplemental Response to Defendant's Motion for Summary Judgment ("Motion to Supplement") (ECF No. 104).

For the reasons explained in detail below, the Court finds that Gunther Toody's has failed to offer a construction of the restrictive covenant that does not render most of its language superfluous. Melody Lane's summary judgment motion is therefore well-

taken and will be granted as to all causes of action. The Court finds that this result would be the same even taking into account the proffered opinions of Gunther Toody's experts, so Melody Lane's Rule 702 Motion will be denied as moot. Conversely, the Court has ignored the proffered opinion of Melody Lane's expert, and so Gunther Toody's Rule 702 Motion will also be denied as moot. Finally, the Court finds that the information Gunther Toody's seeks to add through its Motion to Supplement was substantially in the record already and does not change the Court's analysis. Thus, the Motion to Supplement will be denied as moot. All pretrial and trial proceedings will be vacated and final judgment will enter in favor of Melody Lane.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right

to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II.  FACTS & PROCEDURAL HISTORY

The following facts are undisputed unless attributed to one party or another, or otherwise noted.

### A.    The Gunther Toody's Restaurant at Northglenn Marketplace

Melody Lane claims that it owns a shopping center on 104th Avenue in Northglenn, Colorado, known as the "Northglenn Marketplace."  (ECF No. 78 at 3, ¶ 1.)  Gunther Toody's disputes this, asserting that Northglenn Marketplace "is under contract and/or has been sold to another entity."  (ECF No. 83 at 3, ¶ 1.)[1]  In any event, it appears undisputed that, at all times relevant to the events giving rise to this lawsuit, Melody Lane owned Northglenn Marketplace.

In August 1998, Gunther Toody's predecessor-in-interest and Melody Lane's predecessor-in-interest executed the "Ground Lease," permitting the lessee to open and operate in Northglenn Marketplace "a diner-style, full-service restaurant with a liquor license[,] and no other purposes shall be permitted except as may be approved in writing by Landlord, which approval shall not be unreasonably withheld.  Tenant may not sell popcorn from the Premises."  ("Permitted Use Clause," ECF No. 8-1 at 17 (art. X, ¶ B).)  The Ground Lease further contains a restrictive covenant that prohibits the landlord from leasing or selling any other portion of Northglenn Marketplace "for usage as a diner similar in concept to the operation conducted from the Leased Premises by Tenant."  ("Restrictive Covenant," ECF No. 8-1 at 32 (art. XXV, ¶ J).)

---

[1] If Gunther Toody's position is correct and this case were to go to trial, there would be a serious question whether the Court could award specific performance or other injunctive relief in favor of Gunther Toody's.  The Court need not reach this matter given the disposition below.

The restaurant opened by Gunther Toody's predecessor-in-interest was a Gunther Toody's restaurant. Such restaurants are intentionally designed to evoke a 1950s-style diner with features such as vehicles from that era on display, employee uniforms that resemble restaurant uniforms of the 1950s, employees adopting fictitious names associated with the 1950s, a jukebox with 1950s music, checkered flooring, counter seating, and menu items incorporating references to 1950s American culture (*e.g.*, the "Howdy Doody BBQ Burger"). (ECF No. 78 at 13–14.)[2] Not surprisingly, the restaurant serves dishes generally regarded as American cuisine or "comfort food," including American-style breakfast (pancakes, eggs, hash browns, etc.) from 6:00 a.m. to 11:00 a.m. daily. (*See* ECF No. 2-7; ECF No 78 at 12.)

Plaintiff (the entity referred to in this Order as "Gunther Toody's") became owner and operator of the Gunther Toody's restaurant in Northglenn Marketplace sometime in early to mid-2016. (ECF No. 8 ¶ 9.)

**B.      The New IHOP**

On June 16, 2016, Melody Lane executed a lease agreement with non-party Tayseer Zuiater, a franchisee of the International House of Pancakes ("IHOP") system. (ECF No. 78 at 4, ¶ 6.) That lease permits Zuiater to operate at Northglenn Marketplace "a full-service sit-down restaurant serving breakfast food and related beverages as the primary menu item, which is identified as selling 40% or greater of gross sales towards breakfast food and related beverages." (ECF No. 26-2 § 1.17.)

The specific premises leased to Zuiater were previously leased to a different

---

[2] This description comes from a portion of the Argument section of Melody Lane's summary judgment brief, not from its Statement of Material Facts. Gunther Toody's nonetheless fails to refute any portion of it, and so the Court deems it undisputed.

restaurant. (ECF No. 8 ¶ 15.) This building is very close to Gunther Toody's—directly across one of Northglenn Marketplace's internal streets. (*See* ECF No. 73-2 at 6 (satellite photo).) Upon execution of his lease, Zuiater took immediate possession of the premises and began remodeling the building to be an IHOP. (ECF No. 78 at 5, ¶ 9.)

## C. The Estoppel Certificate

Around the same time that Melody Lane and Zuiater were finalizing the IHOP lease, Gunther Toody's was negotiating a new loan. (*See* ECF No. 84-1 at 115.) Eleven days after Melody Lane executed the Zuiater lease (June 27, 2016), Melody Lane executed, at Gunther Toody's request, an Estoppel Certificate and Agreement ("Estoppel Certificate") between Melody Lane, Gunther Toody's, and Gunther Toody's lender. (*Id.*) Through the Estoppel Certificate, Melody Lane represented, among other things, that it was unaware of any Ground Lease defaults, or of "any event or circumstance which, with notice or the passage of time, or both, would constitute a default under the [Ground] Lease." (*Id.* at 116, ¶ 1(c).)

## D. Commencement of this Lawsuit & Preliminary Injunction Proceedings

Gunther Toody's became aware of the coming IHOP by July 20, 2016, at the latest, when it sent a letter to Melody Lane claiming that Melody Lane had violated the Restrictive Covenant by leasing to Zuiater knowing that he planned to operate in IHOP. (ECF No. 78 at 6, ¶ 14.)

Gunther Toody's filed this lawsuit against Melody Lane on September 27, 2016. (ECF No. 1.) On September 30, Gunther Toody's filed an amended complaint, which remains the operative complaint to this day. (ECF No. 8.) In the amended complaint, Gunther Toody's asserts six causes of action, or remedies framed as causes of action:

(1) breach of contract, referring to the Restrictive Covenant and the Estoppel Certificate; (2) breach of the covenant of good faith and fair dealing; (3) specific performance of the Restrictive Covenant; (4) breach of warranty, referring to the representations made in the Estoppel Certificate; (5) declaratory judgment; and (6) injunctive relief.

Along with the complaint, Gunther Toody's filed a Motion for Temporary Restraining Order and Preliminary Injunction ("TRO/PI Motion").  (ECF No. 2.)  The Court denied the TRO portion of that motion because, among other reasons, "the new restaurant is not operating or even close to operating," so Gunther Toody's had failed to "establish a harm so immediate and irreparable that the status quo must be preserved pending a preliminary injunction hearing."  (ECF No. 12 at 2.)

As for the preliminary injunction portion of that motion, the Court eventually denied it as well.  *See Northglenn Gunther Toody's, LLC v. HQ8-10410-10450 Melody Lane, LLC*, 2016 WL 6569099 (D. Colo. Nov. 4, 2016) (ECF No. 35) ("*Gunther Toody's I*").  In particular, the Court found that Gunther Toody's had failed to show a likelihood of success on the merits because it interpreted the Restrictive Covenant to prohibit Melody Lane from leasing to any other diner, rendering superfluous the language from the Restrictive Covenant about a "diner similar in concept" to Gunther Toody's.  *Id.* at *3–4.

Gunther Toody's appealed this denial of its requested preliminary injunction to the Tenth Circuit on December 2, 2016.  (ECF No. 41.)

E.     **The Two Restaurants in Operation**

The IHOP began operating sometime in the first quarter of 2017.  (ECF No. 78 at 5, ¶ 9.)  The following list compares and contrasts the Gunther Toody's and IHOP

restaurants in operation:[3]

- <u>Atmosphere & Decor</u>. The Gunther Toody's restaurant pervasively attempts to evoke 1950s American culture with its interior and exterior design, wait staff uniforms, wait staff fictitious names, menu item names, and so forth. The IHOP has more generic, contemporary decor and does not attempt to evoke any particular time in history.

- <u>Cleanliness</u>. Both restaurants are clean.

- <u>Food Preparation</u>. Both restaurants prepare most of their food on a flat top grill.

- <u>Franchise Awareness</u>. The Gunther Toody's restaurant is part of a 5-restaurant franchise located only in Colorado. The IHOP is part of a 1,600-restaurant franchise located throughout the United States and internationally.

- <u>Hours of Operation</u>. The Gunther Toody's restaurant is open from 6:00 a.m. to either 9:00 or 10:00 p.m., and closes on major holidays. The IHOP restaurant is open 24 hours a day, every day of the year.

- <u>Location</u>. Both restaurants are very close to each other in the same shopping center.

- <u>Menu</u>. Both restaurants build their offerings from the same basic components (*e.g.*, for breakfast fare, both restaurants work from

_____

[3] This information is either undisputed for the same reasons explained in n.2, above (*see also* ECF No. 78 at 12–14), or is taken in the light most favorable to Gunther Toody's, particularly from the rebuttal report of one of Gunther Toody's experts, Mr. Stephen Poludniak (*see* ECF No. 84-2 at 2–3).

pancakes, eggs, hash browns, etc.; for lunch and dinner fare, both restaurants offer hamburgers and French fries). The IHOP offers ten pancake items, as compared to Gunther Toody's two. The IHOP serves breakfast at all times of the day and night, whereas the Gunther Toody's serves breakfast from 6:00 a.m. to 11:00 a.m. The Gunther Toody's restaurant sells alcohol, while the IHOP does not.

- <u>Prices</u>. The two restaurants charge similar prices for similar items.

- <u>Sales of Breakfast Items</u>. The Gunther Toody's restaurant derives about 30% of its revenue from breakfast items. The IHOP restaurant "derives over 2/3 of its business from breakfast menu items." (ECF No. 78 at 13.)

- <u>Type of Service</u>. Both restaurants offer casual table service with made-to-order meals.

## F. The Tenth Circuit's Disposition of the Preliminary Injunction Appeal

On July 24, 2017, the Tenth Circuit affirmed this Court's denial of a preliminary injunction. *See Northglenn Gunther Toody's, LLC v. HQ8-10410-10450 Melody Lane LLC*, 702 F. App'x 702 (10th Cir. 2017) ("*Gunther Toody's II*"). The Tenth Circuit determined that this Court had not abused its discretion in finding a lack of likelihood of success given that Gunther Toody's theory of the case "essentially would broaden the [Restrictive Covenant] to preclude operating any 'diner' in [Northglenn] Marketplace, not just a 'diner similar in concept to' Gunther Toody's." *Id.* at 707.

## III. ANALYSIS

## A. Whether the Restrictive Covenant is Ambiguous

The parties' summary judgment briefs have helpfully sharpened this dispute.

From Melody Lane's perspective, the Restrictive Covenant is unambiguous and no jury, applying that unambiguous meaning, could find in favor of Gunther Toody's.[4]  Gunther Toody's counters that the Restrictive Covenant is ambiguous and so a jury must resolve its true meaning.  *See, e.g.*, *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo. 1996) ("[O]nce a contract is determined to be ambiguous, the meaning of its terms is generally an issue of fact to be determined in the same manner as other disputed factual issues." (internal quotation marks omitted)).[5]  Gunther Toody's does *not* present an alternative argument that it could still prevail before a jury under Melody Lane's construction of the Restrictive Covenant.

In Colorado, "ambiguity of a contract . . . is a question of law."  *Cheyenne Mountain Sch. Dist. No. 12 v. Thompson*, 861 P.2d 711, 715 (Colo. 1993).  "In determining whether an ambiguity exists, [the court] must ask whether the disputed provision is reasonably susceptible on its face to more than one interpretation."  *Allen v.*

---

[4] Melody Lane presents several alternate arguments for summary judgment, one of which is that all of Gunther Toody's causes of action fail to the extent they seek damages (as opposed to an injunction) because Gunther Toody's neglected its Rule 26(a)(1)(A)(iii) duty to disclose a damages calculation with supporting evidence, and so Rule 37(c)(1) bars any evidence of damages absent substantial justification or harmlessness.  (ECF No. 78 at 23–25.)  The problem with Melody Lane's argument is that it quotes snippets from Gunther Toody's Rule 26 disclosures and other potentially relevant documents but it does not attach those documents for the Court's review.  The Court cannot properly evaluate the dispute, particularly the questions of substantial justification and harmlessness, if Melody Lane will not permit the Court to see the relevant documents in full context.  The Court therefore rejects this basis for granting summary judgment in Melody Lane's favor.

[5] "As this court is sitting in diversity, . . . Colorado choice of law principles must be applied in the present case."  *Power Motive Corp. v. Mannesmann Demag Corp.*, 617 F. Supp. 1048, 1049 (D. Colo. 1985).  The Ground Lease states that it "has been negotiated in and shall be construed and enforced in accordance with the laws of the State of Colorado."  (ECF No. 8-1 at 34 (art. XXIX, ¶ A).)  This does not specifically exclude application of Colorado's choice-of-law rules, which could theoretically dictate application of a different state's laws.  However, no party has made such an argument, and in any event it would be exceedingly rare to interpret a contract negotiated in Colorado and respecting Colorado real estate under anything but Colorado's laws.  The Court accordingly finds that Colorado law governs this dispute.

*Pacheco*, 71 P.3d 375, 378 (Colo. 2003).  This determination is necessarily made in the context of "the agreement as a whole."  *Id.*

      1.    <u>Law of the Case</u>

Melody Lane primarily argues that the Court can short-circuit the entire ambiguity analysis because, it says, lack of ambiguity has already been established as law of the case.  (ECF No. 78 at 9–11.)  Melody Lane points to this Court's and the Tenth Circuit's rejection of Gunther Toody's "diner similar in concept = diner" theory, and then asserts, "Implicit in this ruling, the Court found no ambiguity in the Restrictive Covenant . . . . The Court's interpretation of the covenant is thus a settled question of law that will not change due to any facts, evidence, or arguments that [Gunther Toody's] may later present."  (*Id.* at 11.)

The Court disagrees.  This Court specifically stated that, "*on this record*, Gunther Toody's has not demonstrated a strong likelihood that this argument will succeed." *Gunther Toody's I*, 2016 WL 6569099, at *3 (emphasis added).  The Court later repeated this point in even stronger terms: "Gunther Toody's success cannot be deemed 'likely' on this record.  The Court emphasizes that it is not prejudging the ultimate merits of the parties' positions."  *Id.* at *4.  In affirming, the Tenth Circuit concluded no more than this Court had not abused its discretion.  *See Gunther Toody's II*, 702 F. App'x at 705–06.

Finally, as a general matter, preliminary injunction proceedings rarely establish law of the case.  *Cf. Sherley v. Sebelius*, 689 F.3d 776, 782 (D.C. Cir. 2012) (giving law-of-the-case effect "where the earlier ruling, though on preliminary-injunction review, was established in a definitive, fully considered legal decision based on a fully developed

factual record and a decisionmaking process that included full briefing and argument without unusual time constraints").  In the typical case, such as this one, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  This applies equally well to summary judgment proceedings.  *City of Chanute v. Williams Nat. Gas Co.*, 955 F.2d 641, 649 (10th Cir. 1992), *overruled by Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137 (10th Cir. 1997); *Navajo Health Found.-Sage Mem'l Hosp., Inc. v. Burwell*, 256 F. Supp. 3d 1186, 1224 (D.N.M. 2015).  And although the Supreme Court spoke in terms of *granting* a preliminary injunction, there is no reasoned distinction why *denying* a preliminary injunction should be treated differently.

The Court accordingly concludes that its and the Tenth Circuit's prior rulings did not establish lack of ambiguity as law of the case.

### 2.  Melody Lane's Previous Ambiguity Argument

In a similar vein, Gunther Toody's asserts that Melody Lane has already conceded that the Restrictive Covenant is ambiguous.  (ECF No. 83 at 12.)  Gunther Toody's points to a passage from Melody Lane's response to the TRO/PI Motion in which Melody Lane argued from Colorado case law that restrictive covenants should be interpreted in favor of unrestricted use of property, and then followed up that argument with a comparison to a trial court decision in a supposedly analogous case, *Spiro & Niketas Food Corp. v. MLO Great South Bay LLC & Mall Properties, Inc.*, 2014 WL 2607102 (N.Y. Sup. Ct. Suffolk Cnty.):

> [T]he *Spiro* court found that the term "diner type" restaurant was ambiguous and ill-defined in that lease and, therefore, adopted the least restrictive interpretation in determining whether the new leases were in violation of that plaintiff's

lease.  Here, the term "diner similar in concept" is similarly
ambiguous, and the Court should apply the least restrictive
interpretation of this narrow restrictive covenant pursuant to
these authorities.

(ECF No. 26 at 10–11.)  Melody Lane counters that Gunther Toody's "mischaracterizes"

its prior argument: "While the referenced page includes a single use of the word

'ambiguity,' [the] point was that, assuming *arguendo* ambiguity could be found in the

Restrictive Covenant, such ambiguity should be interpreted narrowly with the least

restrictive interpretation pursuant to *Spiro* . . . ."  (ECF No.  88 at 4 n.1.)

Melody Lane's explanation is not terribly convincing, but it does not matter.  If

there was any argument to make based on Melody Lane's response to the TRO/PI

Motion, it would be judicial estoppel, which "generally prevents a party from prevailing in

one phase of a case on an argument and then relying on a contradictory argument to

prevail in another phase."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal

quotation marks omitted).  But Gunther Toody's does not actually make a judicial

estoppel argument, or any other argument that Melody Lane's prior position should be

given some sort of preclusive effect in these proceedings.  Moreover, at least with

respect to judicial estoppel, any such argument would fail because neither this Court nor

the Tenth Circuit relied on an argument from Melody Lane that the Restrictive Covenant

was ambiguous.  Melody Lane therefore did not prevail on that argument, *cf. Eastman

v. Union Pac. R.R. Co.*, 493 F.3d 1151, 1156 (10th Cir. 2007) (in deciding whether to

apply judicial estoppel, a court must "inquire whether the suspect party succeeded in

persuading a court to accept that party's former position"), and so the Court finds that it

is of no current significance.  The Court can now turn to construing the relevant contract

language directly.

3.   <u>The Meaning of "Diner Similar in Concept to the Operation Conducted from the Leased Premises by Tenant"</u>

In resolving the parties' dispute over "diner similar in concept to the operation conducted from the Leased Premises by Tenant," the Court finds that there are four major questions to answer.  First, what is a diner?  Second, is the IHOP restaurant a diner?  If so, then third, what does "similar in concept to the operation conducted from the Leased Premises by Tenant" mean?  And, fourth, is the IHOP restaurant "similar in concept to the operation conducted" at the Gunther Toody's restaurant?  The Court addresses these questions in turn.

a.   *Definition of "Diner"*

Taking the facts in the light most favorable to Gunther Toody's, the Court will adopt the definition of "diner" put forth by two of Gunther Toody's proffered experts, Mr. Michael Stevens and Mr. Tim Belinski.  According to Mr. Stevens, a diner is a "family-friendly" "seated dining restaurant[]" "serv[ing] traditional American dishes such as cheese burgers, fries, salads, steak and mashed potatoes, club sandwiches, BLTs, ice cream sundaes and other simple fair [*sic*]."  (ECF No. 2-14 ¶¶ 11, 13.)  Mr. Belinski, offers a consistent but more elaborate definition:

> A diner or diner-style restaurant is broadly known as a restaurant with an expansive menu offering with a "home-cooked meal" feeling.  Breakfast includes an extensive set of menu choices with eggs and egg dishes, breakfast meats such as bacon and sausage, and also pancakes and waffles.  Lunch and dinner includes burgers and sandwiches with French fries, comfort food choices, and special dessert options with ice cream, fountain drinks, and other confections with all food reasonably priced.  Customers are provided full table service, bottomless cups of coffee, a casual setting, booth and bar counter seating, whimsical interior design, and entry to check out within 45 minutes.

(ECF No. 73-2 at 4–5.)  In short, "diner" means what the Court understood Gunther

13

Toody's to be asserting at the preliminary injunction stage: "a table service restaurant with a broad array of breakfast, lunch, and dinner offerings, most of which are perceived as American cuisine." *Gunther Toody's I*, 2016 WL 6569099, at *3.[6]

b.    *Whether the IHOP Restaurant is a "Diner"*

Melody Lane chooses not to contest the IHOP's status as a diner, deeming the matter "irrelevant under the law of the case establishing that Restrictive Covenant applies only to bar leases to 'diners similar in concept.'" (ECF No. 78 at 9.) As already noted, however, law of the case does not apply here. Thus, the Court deems it conceded that the IHOP is a "diner" as defined above.[7]

c.    *Definition of "Similar in Concept to the Operation Conducted from the Leased Premises by Tenant"*

Gunther Toody's continues to urge, as it did in the preliminary injunction proceedings*, see Gunther Toody's I*, 2016 WL 6569099, at *3, that the "similar in concept" phrase from the Restrictive Covenant must be "construed together and harmoniously" with the Permitted Use Clause. (ECF No. 83 at 7.) Again, the Permitted Use Clause states that the leased premises "may be used and maintained as a diner-style, full-service restaurant with a liquor license and no other purposes shall be permitted except as may be approved in writing by Landlord, which approval shall not

---

[6] Gunther Toody's asserts that yet another of its experts, Mr. Stephen Poludniak, defines "diner" simply as a "casual restaurant having a varied menu." (ECF No. 83 at 16.) In reality, Mr. Poludniak draws that definition from *Melody Lane's* expert's report, and it is not clear Mr. Poludniak agrees with it. (ECF No. 84-2 at 1, ¶ 3 ("Mr. Weil's closest definition that fits the word 'diner' is 'casual restaurant offering a varied menu.' . . . [T]his is a very general and broad definition . . . .").)

[7] Given this, Mr. Belinski's expected expert testimony is irrelevant beyond his definition of a diner because he goes no further than to conclude that the Gunther Toody's and the IHOP are both diners or "diner-style" restaurants. (ECF No. 73-2 at 4–5.) His opinion contains nothing about similarity of concept.

be unreasonably withheld. Tenant may not sell popcorn from the Premises." (ECF No. 8-1 at 17 (art. X, ¶ B).) Gunther Toody's claims that the Permitted Use Clause "defines the nature of the 'operation conducted' by Gunther Toody's, and this definition is incorporated into the language of the [Restrictive Covenant]." (ECF No. 83 at 7.)

As to the latter clause of this sentence, Gunther Toody's overstates its case. Nothing in the Restrictive Covenant makes any reference to the Permitted Use Clause, so Gunther Toody's cannot baldly assert that the Permitted Use Clause is incorporated into the Restrictive Covenant. Nonetheless, the Court understands the more general point, which is better captured by the first clause of Gunther Toody's sentence, *i.e.*, that the Permitted Use Clause "defines the nature of the 'operation conducted' by Gunther Toody's."

The Court agrees with this statement but the proposition establishes nothing of relevance to the current dispute. Yes, without written approval from Melody Lane, Gunther Toody's must operate a diner-style, full-service restaurant with a liquor license and without popcorn sales. And, as far as the record reveals, Gunther Toody's has never attempted to operate as anything other than that. So when determining whether some other Northglenn Marketplace restaurant is a "diner similar in concept to the operation conducted from the Leased Premises by Tenant," the question may fairly be reframed as whether the other restaurant is a diner similar in concept to the diner-style, full-service restaurant with a liquor license and without popcorn sales that Gunther Toody's currently operates.

But recognizing as much does not advance the cause of understanding what this contractual language means. To say that the "operation conducted" by Gunther

Toody's is a diner-style full-service restaurant is to say that Gunther Toody's *is a diner*. But the Restrictive Covenant already presumes this—about Gunther Toody's *and* about the sort of restaurant that the Restrictive Covenant is meant to exclude.

Thus, the question remains: what does "diner *similar in concept*" mean?  To the extent Gunther Toody's continues to assert that this language was meant to encompass all diners, Gunther Toody's runs into the same stumblingblock that tripped it up in preliminary injunction proceedings:

> Gunther Toody's arguments make clear . . . that it interprets "diner similar in concept to the operation conducted from the Leased Premises by Tenant" as a long-form name simply for "diner." . . .
>
> Colorado courts strive to avoid any interpretation that would render contractual language meaningless or redundant. *See, e.g.*, *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 700 (Colo. 2009); *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo. 1984).  Thus, without more, the Court cannot agree that the "similar in concept" clause has no independent force—that it does not modify "diner" in some meaningful way.

*Gunther Toody's I*, 2016 WL 6569099, at *3.  Indeed, this argument would fail even if the contract's drafters had left out the words "in concept."  In such a scenario, there would *still* be a question of whether the competing diner is similar to Gunther Toody's operation as judged by some unspecified metric, necessarily implying that the Restrictive Covenant does not exclude all diners.

In this case, the drafters specified the relevant metric, namely, the competing diner as compared to the "concept" of Gunther Toody's diner.  Again, "concept" cannot refer to diners generally; otherwise the language calling for a comparison would be superfluous, even nonsensical.

The Court notes Gunther Toody's proffered expert testimony as presented in Mr. Stephen Poludniak's affirmative and rebuttal expert reports.[8]  In his affirmative report, Mr. Poludniak opines about "concept" as follows:

> The concept of a restaurant is based on a number of factors, including the food served, the percentage of what food is served, the hours that the restaurant is opened, the ambience, the cost of the food, whether it is a family style restaurant or a bar, the quickness of service, that is, whether it is a sit down to be served at the table restaurant or a quick service serve restaurant and the like.  Without a doubt, however, it is clear people come to restaurants to eat food and drink beverages.  The fundamental concept of a restaurant falls squarely on the type of food and beverages it serves.

(ECF No. 73-1 ¶ 7.)  Also in his affirmative report, Mr. Poludniak quotes from and cites to certain Internet articles discussing what is meant by a "restaurant concept":

> In an article discussing the differences between restaurant concepts and brands, the author defines a restaurant concept as ". . . a general idea of what you offer: EG: a quick serve breakfast cafe, a full-service American buffet, etc.  The **concept** is [a] pure utilitarian description and lacks any positioning, advanced differentiation, or brand promises."
>
> In other articles written by experts in the field of restaurants, the term *restaurant concept* centers on the type of food that is served and the format in which it is served, such as sit down or quick service.

(*Id.* ¶¶ 8–9 (ellipses, italics, and boldface in original; footnotes omitted).)  Mr.

---

[8] Gunther Toody's proffers this expert testimony in an attempt to create an ambiguity based on alleged industry usage of the term "concept."  But the Colorado Supreme Court is fairly adamant that "[a]n ambiguity must appear in the four corners of the document before extrinsic evidence can be considered.  In other words, extrinsic evidence cannot create ambiguity; it is an aid to ascertaining the intent of the parties once an ambiguity is found."  *Am. Family Mut. Ins. Co. v. Hansen*, 375 P.3d 115, 117 (Colo. 2016).  Melody Lane, however, never objects on this basis, probably because of its continuing insistence that lack of ambiguity was established as law of the case.  Because Melody Lane does not object, and because it is not clear that the Colorado Supreme Court would reject extrinsic evidence about the meaning of a particular term as used in a particular industry, the Court will assume that Gunther Toody's expert evidence may be considered when analyzing whether an ambiguity exists.

Poludniak's rebuttal report draws on the same Internet sources. (ECF No. 84-2 at 1–2.)[9] Thus, according to Mr. Poludniak, a restaurant concept embraces no more than the type of cuisine (*e.g.*, American, Italian, Mexican, Thai) plus the type and speed of service (*e.g.*, table service vs. ordering at the counter, cooked to order vs. fast food).

Applying Mr. Poludniak's definition, Gunther Toody's utilitarian, brand-undifferentiating "concept" is that of a table service restaurant serving a wide variety of traditionally American dishes—or in other words, it is a *diner*. And we are right back where we started.

Thus, even accepting Mr. Poludniak's definition as the typical definition of "concept" in the restaurant industry, it cannot be adopted as the definition of "concept" in the Restrictive Covenant without rendering the "similar in concept" clause senseless. The Restrictive Covenant plainly asks "Are these two diners similar in concept?" while Gunther Toody's continues to insist, contrary to the plain language, that the inquiry should be "Are these two restaurants diners?" Gunther Toody's has accordingly failed to offer two reasonable interpretations of the Restrictive Covenant, and therefore failed to demonstrate any ambiguity.

### d. *Whether the IHOP Restaurant is "Similar in Concept to the Operation Conducted" at the Gunther Toody's Restaurant*

The analysis essentially ends here because Gunther Toody's offers no argument that the Restrictive Covenant should be interpreted in its favor as a matter of law, and no alternative path to present its case to a jury (*e.g.*, "Regardless of whether the Restrictive Covenant is ambiguous . . ."). The Court notes, however, that Melody Lane

---

[9] The Court assumes, without deciding, that the sources Mr. Poludniak quotes and cites are the kind on which an expert in his field "would reasonably rely . . . in forming an opinion on the subject." Fed. R. Evid. 703.

would still be entitled to summary judgment even if Gunther Toody's had some notion of proceeding under Mr. Poludniak's broader definition of "concept," which includes "a number of factors" beyond type of cuisine and format of service, such as percentages of menu items, hours of operation, and family friendliness. (ECF No. 73-1 ¶ 7.) Melody Lane's summary judgment motion argues based on precisely these factors (and others) that no reasonable jury could find the IHOP restaurant to be a diner similar in concept to the Gunther Toody's restaurant. (*See* ECF No. 78 at 12–17.) Gunther Toody's entirely ignores this argument, and has thus forfeited any counterargument.

    4.    <u>The Motion to Supplement</u>

Following the close of summary judgment briefing, Gunther Toody's original counsel withdrew and new counsel entered their appearance. (*See* ECF Nos. 97, 99–102.) Not long afterward, Gunther Toody's filed its Motion to Supplement, requesting that the Court admit two documents into the summary judgment record. (ECF No. 104.)

The first proffered document is a "Franchise Disclosure Document" informing franchisees (such as Zuiater, presumably) that they may not

> directly or indirectly, own, operate, control or have any financial interest in any family style restaurant, pancake house, coffee shop, buffet serving breakfast, or diner, including but not limited to the Village Inn, Bob's Big Boy, Shoney's, Denny's, Perkins', Waffle House, Baker's Square, Coco's, JB's, Aide's, Cracker Barrel, Marie Calendar's, Friendly's, Bob Evans' Farms, Mimi's, Carrows, Denny's Diner, Golden Corral, Original Pancake House, Country Kitchen, Hometown Buffet, *or any other food service operation that sells pancakes or derives more than 25% of its total sales from sit down breakfast items*.

(ECF No. 104-1 at 2 (emphasis added).) The second proffered document is an affidavit from Gunther Toody's managing member attesting that, from December 26, 2016 to

November 27, 2017, the Gunther Toody's restaurant "derived 31.29% of its total sales from sit down breakfast items." (ECF No. 104-2 ¶¶ 2, 5.)

Gunther Toody's argues that these two documents "are highly relevant to a determination of whether the phrase 'similar in concept' is ambiguous, and if so, to a resolution of the ambiguity." (ECF No. 106 ¶ 1.) Gunther Toody's asserts that the documents demonstrate that IHOP (*i.e.*, the corporate franchisor) would consider the Gunther Toody's restaurant to be a competitor, and that this is relevant to demonstrating the ambiguity in the phrase "similar in concept." (*Id.* ¶¶ 2–4.)[10]

The Court need not decide whether Gunther Toody's has shown sufficient cause to supplement the summary judgment record because the relevant information conveyed by the two documents was included in Mr. Poludniak's rebuttal expert report, which Gunther Toody's attached to its summary judgment response brief. (*See* ECF No. 84-2 at 3–4.) Indeed, Mr. Poludniak asks rhetorically, "Now why would the [Franchise Disclosure Document's anti-competition clause] be so adamant about [percentage of breakfast sales] unless the Gunther Toody's type diner and IHOP are both competitive and similar?" (*Id.* at 4.)

But the argument, whether derived from Mr. Poludniak's report or the proffered supplemental documents, does not help Gunther Toody's to demonstrate an ambiguity. The question is not what IHOP deems to be competitive, but what the Restrictive Covenant deems to be a "diner similar in concept to the operation conducted from the Leased Premises by Tenant." The Court does not doubt that Gunther Toody's predecessor-in-interest (the original contracting party) wanted the Restrictive Covenant

---

[10] As noted above at n.8, the Colorado Supreme Court frowns on using extrinsic evidence to demonstrate ambiguity. But, as before, Melody Lane does not object on this basis.

in the Ground Lease to prevent competition from other diners, but the actual language of the contract is not that broad.  To repeat, the Restrictive Covenant does not come into play unless the new restaurant is already "a diner," and then it asks for a comparison of the new diner's "concept" to the existing diner's "concept."

At the very most, a jury might infer from the Franchise Disclosure Document that the IHOP franchisor (which is not the same as Melody Lane) would consider the Gunther Toody's restaurant to be competitive to IHOP franchises because of Gunther Toody's breakfast sales, and so perhaps the IHOP franchisor (again, not Melody Lane) might deem the Gunther Toody's restaurant to be "similar in concept" to an IHOP *as to that matter*—a matter the IHOP franchisor (not Melody Lane) would naturally deem highly relevant given IHOP's brand positioning as an all-day-breakfast restaurant.  But this simply has no relevance to the meaning of the Restrictive Covenant entered into between Gunther Toody's (not an all-day-breakfast restaurant) and Melody Lane (not a franchisor at all, much less of all-day-breakfast restaurants).

Accordingly, the Franchise Disclosure Document and related evidence does not rescue Gunther Toody's claims from summary judgment.

*   *   *

For the reasons explained, Melody Lane is entitled to summary judgment on Gunther Toody's claim that Melody Lane breached the Restrictive Covenant.

**B.    The Estoppel Certificate**

Melody Lane argues that if it did not breach the Restrictive Covenant, then it did not breach the Estoppel Certificate either.  (ECF No. 78 at 17.)  Gunther Toody's attempts to rescue this claim by recharacterizing the Estoppel Certificate as Melody

Lane's "affirmative assurance[] and warrant[y] that it was unaware of any circumstance that would adversely affect the use or value of the lease." (ECF No. 83 at 18.) But the Estoppel Certificate is not nearly that broad. Melody Lane only warranted that it was unaware of any defaults or any circumstances that, with the passage of time, would ripen into a default. (*See* Part II.C, above.) Because leasing to Zuiater for purposes of operating an IHOP franchise was not a default under the Ground Lease, Melody Lane's representations were accurate.

Melody Lane is entitled to judgment as a matter of law on Gunther Toody's claim that Melody Lane breached the Estoppel Certificate.

## C.    Good Faith & Fair Dealing

With no breach of the Restrictive Covenant or the Estoppel Certificate, Melody Lane argues that it likewise cannot be liable for breach of the covenant of good faith and fair dealing. (ECF No. 78 at 20–21.) In Colorado,

> [t]he duty of good faith and fair dealing applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time. The covenant may be relied upon only when the manner of performance under a specific contract term allows for discretion on the part of either party. However, it will not contradict terms or conditions for which a party has bargained.

*Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995) (citations omitted).

Gunther Toody's argues that Melody Lane had discretion whether to lease to Zuiater for purposes of an IHOP, and whether to disclose the Zuiater lease when signing the Estoppel Certificate. (ECF No. 83 at 20–21.) From a purely factual perspective, this is true, but unhelpful to Gunther Toody's. Melody Lane surely could have chosen not to do business with Zuiater, but not because *the Ground Lease*

contains any specific contract term granting such discretion. It was simply within Melody Lane's business discretion as an independent actor. And yes, when Melody Lane signed the Estoppel Certificate, it could have also disclosed the Zuiater lease, but not because *the Estoppel Certificate* contains any specific contract term granting discretion whether to disclose the lease or not. Again, it was simply within Melody Lane's business discretion as an independent actor.

Because Gunther Toody's has failed to articulate a viable good faith and fair dealing theory, Melody Lane is entitled to summary judgment on this claim.

**D.    Remaining Claims**

Given the foregoing, Gunther Toody's only remaining claims are for specific performance and injunctive relief. But these are really derivative remedies that depend on proving a substantive cause of action. All substantive causes of action having failed, these remedial requests likewise fail.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Defendant's Motion for Summary Judgment (ECF No. 78) is GRANTED;

2.    Defendant's Motion to Exclude the Opinions of Proposed Expert Witnesses Stephen E. Poludniak, Timothy Belinski and Steve Mize (ECF No. 79) is DENIED AS MOOT;

3.    Plaintiff's Motion to Exclude Defendant's Expert Richard F. Weil (ECF No. 80) is DENIED AS MOOT;

4.    Plaintiff's Motion for Leave to File Supplemental Response to Defendant's Motion for Summary Judgment (ECF No. 104) is DENIED AS MOOT;

5.    The Final Trial Preparation Conference scheduled for May 23, 2018, and the

      5-day jury trial scheduled to begin on June 11, 2018, are both VACATED;

6.    The Clerk shall enter judgment in favor of Defendant and against Plaintiff, and

      shall terminate this case.  Defendant shall have its costs upon compliance with

      D.C.COLO.LCivR 54.1.


      Dated this 12th day of April, 2018.

                                                    BY THE COURT:



                                                    _____
                                                    William J. Martinez
                                                    United States District Judge